1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11

HEIDI HALLENBERG, AND BRANDON
WALKER,

12

Plaintiffs,

13

v.

14

DARRICK WALKER, et al.,

15

Defendants.

16

Case No.  1:24-cv-01486-JLT-BAM

ORDER DENYING DARRICK WALKER'S
MOTION TO TRANSFER UNDER 28 U.S.C.
§ 1404(a)

(Doc. 5)

17       Heidi Hallenberg and Brandon Walker allege their brother Darrick Walker embezzled and

18   misappropriated funds from BDH Group, LLC, an entity equally owned by Brandon, Heidi, and

19   Darrick.  Defendant seeks transfer of the action to the United States District Court, District of

20   Wyoming pursuant to 28 U.S.C. § 1404(a).  (Doc. 5.)  The Court deemed the motion suitable for

21   decision without oral argument pursuant to Local Rule 230(g), and vacated the hearing set for

22   February 14, 2025.  (Doc. 15.)  For the reasons set forth below, Defendant's motion to transfer

23   will be denied.

24   **I.       BACKGROUND AND ALLEGATIONS**

25       Plaintiffs are California residents.  They initiated this action on October 29, 2024, in

26   Fresno County Superior Court.  (Doc. 2.)  Defendant, a Wyoming resident, removed the matter to

27   this Court on December 5, 2025.  (*Id.*)  The operative complaint alleges as follows:

28       The Walker family has been in the farming business for generations.  Plaintiff Brandon

1

1  Walker is the eldest child of Jim and Sharon Walker.  Defendant Darrick Walker is the second

2  child, and Plaintiff Heidi Walker is the third child.  The family farms across the Central Valley

3  through a number of related entities.  (Doc. 2, Ex. A, Compl. ¶ 8.)

4        Defendant BDH Group, LLC, ("BDH") is an entity equally owned by Brandon, Derrick,

5  and Heidi as its members.  BDH originated from a small real estate company called B & D

6  Walker Real Estate, LLC, established around 2006.  Initially, BDH purchased five lots in Merced,

7  with one used to a create a larger property to rent to Frito Lay Corporation.  (Compl. ¶ 9.)

8  Following the dissolution of B & D Walker Real Estate, LLC, its assets were transferred to BDH,

9  which was created to manage the non-farming real estate investments, with the intention of

10  diversifying and reducing risk.  Each sibling—Brandon, Darrick, and Heidi—holds a one-third

11  share in BDH.  (*Id.* ¶ 10.)  As time progressed, BDH became a 50% owner of WB Capital

12  Partners, LLC ("WBCP"), with the remaining 50% owned by David and Marilyn Britz or their

13  entities.  WBCP acquired two completed FedEx Ground facilities:  one in Youngstown, Ohio, and

14  another in Salem, Oregon.  (*Id.* ¶ 11.)

15        Subsequent ventures included WBCP2, which was involved in acquiring a portion of a

16  FedEx building in Grand Junction, Colorado.  Brandon was an individual investor in this venture.

17  Given Darrick's background as a financial investor and broker, Plaintiffs deferred to Darrick to

18  handle all of BDH's finances.  For the operation of BDH, Plaintiffs allegedly were so historically

19  and entirely reliant on Darrick that large transactions took place without Plaintiffs' knowledge or

20  consent.  For instance, Brandon first became aware of the Colorado building's sale in Spring

21  2023, which was significantly after its sale.  At that time, Darrick claimed to have distributed

22  payouts from the sale.  To date, Brandon and Heidi remain unable to fully account for all

23  distributions.  (*Id.* ¶ 12.)

24        Another entity, WBCP3, was formed to purchase a Walgreens drug store in the greater

25  Chicago area, with BDH having some undetermined role with the Britzs holding at a 50% stake.

26  This entity was short-lived, lasting about two to three years before being sold, with questionable

27  accounting practices and no oversight.  Brandon still lacks a complete accounting of the

28  enterprise.  (Compl. ¶ 13.)

1      WBCP4 was established to acquire a portion of a FedEx Ground building in Fresno,

2  California, involving several investors, including the three individual principals of BDH (about

3  40%) and the Britzs (about 45%).  The building was sold before Fed Ex could exercise its

4  expansion option, and the funds rolled over into a Walgreens located in Minneapolis, Minnesota.

5  Following, Heidi and Brandon had expressed their desire to exit the partnership with the Britz

6  family but were not consulted about Darrick's subsequent investment in Idaho farmland with the

7  Britzs with BDH money.  Neither Heidi nor Brandon authorized or knew in advance of the

8  purchase of the Idaho farmland with the proceeds of the sale.  WBCP4 is owned individually by

9  Darrick, Heidi, and Brandon.  (Compl. ¶14.)

10      As time passed, Darrick operated and controlled the finances of BDH as if they were

11  100% his own even where Plaintiffs objected.  This recently extended to the two partnerships:  (1)

12  B & D Walker Farms, a California general partnership of which Darrick and Brandon are the sole

13  partners, which owns properties in Fresno and Merced counties, some of which are planted with

14  almonds; and (2) B&D Walker Farms and Heidi Walker, a California general partnership, which

15  owns property in Fresno County planted with pistachios.  (Compl. ¶¶ 3, 4, 15.)  As Plaintiffs

16  recently came to learn, Darrick had instructed principals at the Wonderful Processing Company,

17  the company processing the partnership crops, to divert funds away from the partnership accounts

18  to an account solely controlled by Darrick.  Darrick did the same things for the almonds by

19  contacting the Almond Company and telling them not to remit payment to partnership accounts

20  where either Brandon or Heidi had access.  As a result, the partnership operations will be

21  dramatically impacted as the capital needed to fund those operations has recently been diverted

22  away from those operations by Darrick.  (*Id.* ¶ 15.)

23      Further, as was recently discovered and then confirmed, Darrick treated BDH's bank

24  account, funds, and resources, as his own personal funds by, among other things, engaging in

25  significant unauthorized spending to the tune of nearly ten million dollars.  Absent consent, and

26  which was only discovered in 2023, Darrick used BDH funds to finance several of his other pet

27  projects and companies, such as Central Valley Ag Partners (1 through 11) and CVAP Ranch,

28  LLC.  At Darrick's direction, hundreds of thousands of dollars from BDH were diverted towards

3

1    development of a grape vineyard for which BDH had no direct financial interest.  (Compl. ¶ 16.)

2            As was discovered in 2023, Darrick has engaged in numerous unauthorized transactions

3    and personal expenditures of BDH funds, including unauthorized loans to his wife and his

4    children's trusts.  The following demonstrate some of the discovered misuses of BDH resources:

5            A)  Darrick's Unauthorized Loans.  The loans were not listed on the BDH books until

6                after Plaintiffs' discovery, and appear to have no direct connection to BDH and

7                represent unauthorized advances for Darrick's personal and/or unrelated businesses.

8                After their discovery, these loans were listed on BDH's books.

9            B)  Darrick's Unauthorized Personal Expenses (partial list):

10               -    Property taxes for Darrick's personal homes;

11               -    Automobile expenses for Darrick's children;

12               -    Personal travel via private plane;

13               -    Insurance unrelated to BDH assess or activities;

14               -    Supplies for agricultural land not owned by BDH; and

15               -    Legal fees unrelated to BDH's business.

16           C)  Darrick's Unauthorized Investments in Other Businesses:

17               -    Brookfield:  Approximately $500,000.  Plaintiffs did not authorize or know in
                       advance about the transaction.
18

19               -    Semios:  Approximately $1,000,000 invested into an unknown enterprise with
                       unknown conditions and terms.  Plaintiffs did not authorize or know about this
                       transaction.
20

21               -    Walker Britz Capital Partners ("WBCP"), a joint venture between BDH and Britzs,
                       each owning 50%.  WBCP purchased approximately 560 acres of pistachios.
                       Plaintiffs did not authorize the transaction or know about it until after the fact.
22

23    (Compl. ¶ 17.)

24           As first discovered in 2023, Darrick's average annualized unauthorized use and personal

25    expenses taken out of BDH counted in the hundreds of thousands of dollars.  Uses ranged from

26    personal taxes on luxury personal properties to private jet travel and ski trips with friends, among

27    others.  In misappropriating funds, Darrick retained a disproportionate share of BDH's ongoing

28    value.  (Compl. ¶ 18.)

4

1    Plaintiffs allege that "what eventually tipped off the many years of embezzlement was

2    ultimately an unauthorized loan and a diligent banker." (Compl. ¶ 19.)  Fresno Madera Farm

3    Credit is an agricultural lender and Jenhi Ciapponi has historically served as the banker for the

4    Walker entities.  On Tuesday, September 5, 2023, Jenhi Ciapponi requested signatures from

5    Brandon and Heidi around 9:00 a.m. for a loan that Darrick had applied for absent Plaintiffs'

6    knowledge.  Plaintiffs asked about the loan and indicated they had not authorized such a loan.

7    Later that day, at approximately 3:30 p.m., Jenhi informed Brandon that she had already received

8    their signatures.  Brandon promptly called Jenhi, and reported that neither he nor Heidi had

9    signed the application, nor did they consent to the loan nor to be personally bound by its terms.

10   Jenhi then indicated that she had received their signatures via email from Darrick.  (*Id.* ¶ 19.)

11   Brandon and Heidi requested and received copies of the purported signatures, which were forged.

12   At approximately 3:45 to 4:00 p.m., Brandon notified Jenhi that the signatures were fraudulent.

13   (*Id.* ¶ 20.)

14        On September 13, 2023, at approximately 9:00 a.m., Darrick entered the farm office using

15   Jim's code to disable the alarm, which Brandon did not initially know.  Brandon arrived at the

16   office at 9:07 a.m. and found himself in an ambush-style meeting that Darrick had orchestrated.

17   (Compl. ¶ 21.)  Darrick wanted to discuss the WBCP, LLC crop loan and its history, and

18   convince Brandon not to report the bank fraud.  As captured on the ring camera in the office,

19   Darrick expressed that he would lose his securities license if his forgeries on bank loans and

20   applications were discovered.  Brandon informed Darrick that Jenhi Ciappoini had contacted him,

21   and told him everything that had happened.  Darrick pleaded with Brandon to please invent a lie

22   to save him.  Brandon refused.  Darrick then proposed a meeting among Brandon, Darrick, and

23   Heidi to resolve those issues Darrick had created and to prepare necessary documents.  (*Id.* ¶ 22.)

24        In this time period, Plaintiffs allege that they began to first discover some of Darrick's

25   alleged embezzlement along with the extreme degree to which Darrick had gone to hide it across

26   many companies and confusing journal entries.  (Compl. ¶ 23.)

27        On September 13, 2023, at approximately 3:00 p.m., Jim Walker confronted Brandon

28   about the "huge mess."  Brandon informed Jim that Jim did not know the facts, specifically that

1  Darrick had forged signatures for both Brandon and Heidi on loan applications, which was the

2  root cause of the problem.  Brandon told Jim that Plaintiffs were just discovering a vast array of

3  accounting improprieties which appeared to be theft to the tune of tens of millions of dollars.  As

4  it turns out, Darrick forged Plaintiffs signatures on many documents including on trust

5  documents.  (Compl. ¶ 24.)  When Brandon raised the forgeries and the theft, Jim claimed that

6  Darrick had made Plaintiffs money and Plaintiffs were just ungrateful.  Plaintiffs allege that Jim,

7  who is elderly, had and has been manipulated by Darrick against both Heidi and Brandon.  Jim

8  criticized Plaintiffs' contributions and expressed feelings of betrayal that Plaintiffs would not turn

9  a blind eye to theft, embezzlement, and bank fraud, which Plaintiffs allege is inconsistent with

10  Jim's character.  (*Id*. ¶ 25.)

11      Out of respect for their father and to avoid a lawsuit, the siblings entered into a tolling

12  agreement through counsel to resolve the issues out of court.  After months of informal

13  discussions, Darrick allegedly became emboldened and started to claim, falsely, that Plaintiffs

14  themselves had engaged in wrongdoing.  Plaintiffs allege that such a claim is provably false as

15  solely Darrick maintained control over their entities and their accounting.  Darrick also instructed

16  third-party processors to divert money away from both partnership banks to ones Darrick had

17  100% control over at UBS bank.  Plaintiffs further allege that it came to a point where Plaintiffs

18  had to ask for Darrick's consent to obtain funds in any amount, including 20 dollars.  Darrick now

19  reportedly claims that Plaintiffs took money from farming entities in a non-authorized fashion,

20  which Plaintiffs claim is false.  For these reasons, Plaintiffs assert that they need, but do not have

21  full access to the following farm entities, which are named in this lawsuit to both provide an

22  accounting and also so that Plaintiffs' interests may be sold and/or those entities dissolved:  (1)  B

23  & D Walker Farms:  Owned by Brandon and Darrick Walker, it includes 160 acres of mature

24  almonds, the land on another 160 acres (non the trees or improvements), 320 acres of row crop

25  land, and leases additional land.  (2) B & D Walker Farms and Heidi Walker:  This partnership

26  includes 50% ownership by B & D Walker Farms and 50% by Heidi Walker (collectively

27  "Partnerships" or "California partnerships.")  (Comp. ¶ 26.)

28      Plaintiffs, individually and through counsel, have met with Darrick on multiple occasions

1    to secure Darrick's return of allegedly embezzled BDH funds.  While Darrick reportedly has

2    acknowledged having misappropriated BDH's funds, he has failed to return the funds, and instead

3    has insisted that unrelated transactions across other entities excuse his conduct and/or should

4    count as offset.  Plaintiffs claim that they are excused from making any further demand on BDH

5    as Darrick solely controls BDH, solely controls the accounting, solely controls the bank accounts,

6    has forged Plaintiffs' names on numerous documents, and refuses to return the money.  Plaintiffs

7    contend that despite being legally excused from having to make such a demand that may

8    otherwise conform with California Corporations Code § 17709.02, Plaintiffs tried in vain on

9    October 7, 2024, and sent a § 17709.02 written demand letter seeking that Darrick agree to return

10    and reimburse the unauthorized personal expenses and loans and unwind a transaction taken in

11    excess of his authority.  In response, through counsel, Darrick declined to take action and

12    declined having engaged in any wrongdoing, making any further demands futile.  (Compl. ¶ 27.)

13        Plaintiffs forward the following causes of action:  (1) Breach of Fiduciary Duty against

14    Defendant Darrick Walker; (2) Receivership against Defendant BDH and Partnerships; (3)

15    Preliminary and permanent injunction against defendants; (4) Dissolution of Partnerships and

16    BDH; (5) Accounting of Partnerships and BDH; (6) Violation of Penal Code § 496(a) against

17    Defendant Darrick Walker. (*See generally* Compl.)

18        Defendant Darrick Walker filed the instant motion to transfer venue to the United States

19    District Court, District of Wyoming on January 6, 2025,[1] along with a request for judicial notice

20    (Docs. 5, 5-3.)  Defendant contends that this action should be transferred to the District of

21    Wyoming because Plaintiffs improperly seek to force him to litigate claims in California that are

22    governed by Wyoming law, made against a Wyoming resident and a Wyoming company with its

23    principal place of business located in Wyoming.  Defendant further contends that the complaint

24    fails to establish factual allegations that California courts have any legitimate interest in hearing a

25    family business dispute intrinsically tried to Wyoming.  Defendant argues that transferring the

26

27    _____

[1] Defendant subsequently filed a notice of errata indicating that the incorrect exhibits were attached to
28    Defendant's supporting declaration.  Defendant therefore requested that the Court disregard the exhibits
originally submitted and replace them with the exhibits included with the notice.  (Doc. 6.)

1   action to Wyoming will serve the interest of justice and convenience of the parties because the

2   claims are subject to Wyoming law, the majority of witnesses are located in or around Wyoming,

3   the relevant BDH business records are stored in Wyoming, and all of the corporate decisions

4   subject to the dispute were made in Wyoming.  (Doc. 5-1 at 2.)

5          Plaintiffs opposed the motion to transfer on January 23, 2025.  (Doc. 7.)  Plaintiffs assert

6   that two out of three entities at issue in this case are California entities, Plaintiffs are California

7   residents—with Defendant himself having a home and business here, the important witnesses

8   relevant to the claims in this case are almost exclusively in California, the claims are subject to

9   California law, and the harm took place in California as to California loans and businesses.  (Doc.

10  7 at 2.)  Defendant replied on February 3, 2025.  (Doc. 12.)

11       **II.    REQUEST FOR JUDICIAL NOTICE**

12         The Court may take judicial notice of a fact that "is not subject to reasonable dispute

13  because it:  (1) is generally known within the trial court's territorial jurisdiction; or (2) can be

14  accurately and readily determined from sources whose accuracy cannot reasonably be

15  questioned."  Fed. R. Evid. 201(b).

16         Defendant requests that the Court take judicial notice of (1) The Articles of Organization

17  of BDH filed on December 4, 2012, with the Office of the Secretary of State of the State of

18  Wyoming (Exhibit A); (2) The content of the Certificate of Merger of BDH issued on January 10,

19  2013, by the Office of the Secretary of State of the State of Wyoming (Exhibit B); (3) The content

20  of the Certificate of Merger of BDH filed on May 6, 2013, with the Office of the Secretary of

21  State of California (Exhibit C).  (Doc. 5-3.)  A court may take judicial notice of

22  public documents, including Certificates of Merger and Articles of Organization.  *See Gutierrez*

23  *v. Graphic Packaging Int'l, LLC*, No. CV 22-6945-MWF (MAAX), 2023 WL 3402585, at *1

24  (C.D. Cal. Mar. 21, 2023) ("The Certificate of Merger is a public document, and its authenticity

25  can be accurately and readily determined from the Delaware Secretary of State website . . . .

26  Therefore, the Court takes judicial notice of its contents."); *Kaiju Sushi Corp. v. Pac. Emps. Ins.*

27  *Co.*, No. CV 21-6978 PA (AFMx), 2022 WL 4299583, at *2 n.2 (C.D. Cal. Aug. 18, 2022)

28  (taking judicial notice of a Certificate of Merger filed with the California Secretary of State);

1  *Natomas Gardens Inv. Grp. LLC v. Sinadinos*, No. CIV. S-08-2308 LKK/EFB, 2011 WL

2  4352842, at *1 n.1 (E.D. Cal. Sept. 16, 2011) (taking judicial notice of Articles of Organization

3  filed with California Secretary of State).  Exhibits A and B are documents filed with the Secretary

4  of the State of Wyoming, and Exhibit C is a document filed with the Secretary of the State of

5  California.  Accordingly, the Court will take judicial notice of Exhibits A, B, and C.

6      Defendant also requests that the Court take judicial notice that the driving distance from

7  Wilson, Wyoming to Fresno, California is 991 miles based on Google maps (Exhibit D).  (Doc 5-

8  3.)  Courts in the Ninth Circuit have taken judicial notice of Google Maps and its satellite images

9  as to the distance between two points.  *GS Holistic, LLC v. Ashes Plus Nine*, No. 22-CV-07101-

10  YGR (LJC), 2024 WL 2193362, at *3 (N.D. Cal. May 15, 2024) (collecting cases); *see also*

11  *Gastelum v. Pinnacle Hotel Circle LP*, NO. 21-CV-1458 JLS (DEB), 2022 WL 17419366, at * 2

12  (S.D. Cal. Dec. 5, 2022) (taking judicial notice of a printout directly from Google Maps).  Exhibit

13  D is a printout from Google Maps showing the driving distance between Fresno, California and

14  Wilson, Wyoming.  Accordingly, the Court will take judicial notice of Exhibit D.

15      Finally, Defendant requests that the Court take judicial notice of Plaintiffs' complaint

16  against Defendant filed on October 29, 2024, in Fresno County Superior Court (Exhibit E).  (Doc.

17  5-3.)  Upon removal, the complaint was filed on the docket of this Court. (*See* Ex. A to Doc. 2.)

18  "The records of court proceedings cannot reasonably be questioned, and judicial notice may be

19  taken of the Court's record and docket."  *Roman v. Amazon.com Servs., LLC*, No. 1:21-cv-0667

20  JLT, 2021 WL 5166142, at *3 (E.D. Cal. Nov. 5, 2021) (citations omitted).  Accordingly, the

21  Court will take judicial notice of the complaint.

22    In sum, Defendant's request to take judicial notice of the above-mentioned documents is

23  granted.

24  **III.    MOTION TO TRANSFER VENUE**

25    **A.  Legal Standard**

26      Pursuant to 28 U.S.C. § 1404(a), "a district court may transfer any civil action to any other

27  district or division where it might have been brought" for the convenience of parties and

28  witnesses and in the interest of justice.  The purpose of § 1404(a) is "to prevent the waste of time,

energy, and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964).

District courts employ a two-step analysis when determining whether to transfer an action. *Mazik v. Kaiser Permanente, Inc.*, No. 2:19-cv-00559-DAD-JDP, 2024 WL 3011214, at *5 (E.D. Cal. June 14, 2024); *see also Park v. Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1093 (N.D. Cal. 2013). "A court must first consider the threshold question of whether the case could have been brought in the forum to which the moving party seeks to transfer the case." *Park*, 964 F. Supp. 2d at 1093; *see also Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985). "Once the party seeking transfer has made this showing, district courts have discretion to consider motions to change venue based on an 'individualized, case-by-case consideration of convenience and fairness.'" *Park*, 964 F. Supp. 2d at 1093 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988)).

Among the non-exclusive factors a district court may consider in determining whether a transfer is warranted for the convenience of the parties and witnesses and in the interest of justice are: (1) the plaintiff's choice of forum, (2) the respective parties' contacts with the forum, (3) contacts relating to the plaintiff's cause of action in the chosen forum, (4) differences in the costs of litigation in the two forums, (5) the availability of compulsory process to compel attendance of unwilling non-party witnesses, (6) ease of access to sources of proof, (7) the location where relevant agreements, if any, were negotiated and executed, and (8) the state that is most familiar with the governing law. *Randles v. Nationstar Mortg., LLC*, No. 1:24-CV-0177-KES-SKO, 2024 WL 1855720, at *2 (E.D. Cal. Apr. 26, 2024) (citing *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498-99 (9th Cir. 2000)).  A court also may consider "the administrative difficulties flowing from court congestion ... [and] the 'local interest in having localized controversies decided at home.'" *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986). (citation omitted).

**B.  Discussion and Analysis**

At the first step of the transfer analysis, Plaintiffs do not dispute that this action could have been brought in the District of Wyoming.  (*See generally* Doc. 7.)  Accordingly, the Court

moves to the second step and considers whether transfer is warranted for the convenience of the parties and witnesses and in the interests of justice.

### 1. Plaintiffs' choice of forum

Plaintiffs argue that missing from Defendant's analysis of the factors for venue transfer is the substantial deference shown to a plaintiff's choice of forum.  (Doc. 7 at 6.)  "[G]reat weight is generally accorded plaintiff's choice of forum . . . ." *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987).  However, "the weight given to the plaintiff's choice of forum can be diminished if: (1) the plaintiff does not reside in the forum, (2) the transaction giving rise to the litigation did not occur in the forum, (3) the forum was not the plaintiff's first choice, or (4) the plaintiff seeks to represent a class.  *Sims v. United Parcel Serv., Inc.*, No. 19-CV-07551-RS, 2020 WL 2542622, at *7 (N.D. Cal. Jan. 13, 2020) (citing *Park*, 964 F. Supp. 2d at 1094).  Two of the exceptions are applicable here.

First, the Eastern District of California was not Plaintiffs' first choice of forum.  Plaintiffs filed the case in Fresno County Superior Court, and Defendant removed it.  A plaintiff's choice of forum is given less weight when the case has been removed from the state court.  *See Sims*, 2020 WL 2542622, at *7 (indicating weight given to the plaintiff's choice of forum diluted, in part, because federal district was not plaintiff's first choice of forum as case was removed from state court); *see also Gomes v. Wal-Mart Assocs., Inc.*, No. 22-cv-6051-AB (KKx), 2023 WL 5506024, at *5 (C.D. Cal. Apr. 13, 2023) (concluding "deference owed Plaintiff's chosen forum is diminished by the reality that this case was removed to federal court, such that Plaintiff already finds himself outside his preferred venue"); *D.C. v. Thillot*, No. 2:20-CV-11765-SK, 2021 WL 3185071, at *2 (C.D. Cal. May 12, 2021) (indicating "[p]laintiffs' choice of forum lost some of its weight when [defendant] removed case to federal court, thereby depriving them of their originally chosen—state court—forum").

Second, the factual allegations in the complaint primarily involve the operation and control of BDH, a Wyoming business entity, and transactions and business decisions conducted by Defendant in Wyoming.  These allegations include:  Defendant operating and controlling the finances of BDH as if they were 100% his own (Compl. ¶ 15); Defendant treating BDH's

11

account, funds, and resources, as his personal funds, engaging in unauthorized spending (*Id.* ¶ 16); and Defendant engaging in unauthorized transactions and personal expenditures of BDH funds, including loans to his wife and his children's trusts (*Id.* ¶ 17).  "If the operative facts have not occurred within the forum and the forum has no interest in the parties or subject matter, [the] choice is entitled to only minimal consideration."  *Lou*, 834 F.2d at 739.

Notwithstanding that the operative facts generally have not occurred in the Eastern District of California, the complaint includes additional factual allegations involving events occurring in the Eastern District of California.  These allegations include:  Jenhi Ciappoini requesting signatures from Brandon and Heidi on September 5, 2023, for a loan that Darrick had applied for absent Plaintiffs' knowledge, Ms. Ciappoini later informing Brandon that she had received their signatures, which were forgeries, Brandon and Heidi receiving copies of the purported signatures, and Brandon notifying Ms. Ciappoini that the signatures were forgeries (Compl. ¶¶ 19-20); Darrick and Brandon meeting in the farm office on September 13, 2023, Darrick expressing that he would lose his securities licenses if his forgeries on bank loans and applications were discovered, and Darrick pleading with Brandon to invent a lie to save him, which Brandon refused (*Id.* ¶¶ 21-22); and Jim Walker confronting Brandon on September 13, 2023 (*Id.* ¶¶ 24-25).  Further, the harms caused by Defendant's alleged misconduct were suffered by Plaintiffs in California, and Plaintiffs seek receivership, dissolution, and an accounting of the partnerships, B & D Walker Farms and B & D Walker Farms and Heidi Walker (*Id.* ¶¶ 26, 33-35, 40-42, 43-45).

Taken together, the deference afforded the choice of forum is diminished.  This factor therefore weighs only minimally against transfer.

## 2.  Parties' contacts with the forum and contacts relating to Plaintiffs' causes of action

Defendant argues that his and BDH's contact with Wyoming is well-established.  Defendant is a Wyoming resident, he has formed several companies there, and has made Wyoming his long-term home.  (Doc. 5-2, Declaration of Darrick Walker ("Darrick Decl.") ¶¶ I.3, II.A.1.)  Further, BDH was formed in 2012 as a Wyoming limited liability company as

1    demonstrated by BDH's Articles of Organization, and its principal place of business is located in

2    Wilson, Wyoming. (*Id.* ¶¶ I.3, II.A.3, 5 and Doc. 6, Ex. A.) Defendant additionally asserts that

3    BDH is not qualified to do business in California, and has no assets or operations in Fresno

4    County, and all of its records are housed in a storage facility in Wyoming. (Doc. 5-1 at 3-4;

5    Darrick Decl. ¶¶ II.A.3, 5, II.C.1 and Doc. 6, Ex. C.)

6    　　　　Plaintiffs counter that Defendant has personal and substantial contacts with Fresno and

7    with California in general, noting Defendant has a residence in Newport Beach that he stays at on

8    a near monthly basis, he pays property taxes and has business offices in both Danville and Fresno,

9    and he operates a second Central Valley Ag office in Fresno. Additionally, Defendant frequently

10   makes trips to California to manage personal and business matters in Fresno. (Doc. 7-1,

11   Declaration of Brandon Walker ("Brandon Decl.") ¶ 4). In contrast, Plaintiffs indicate that they

12   have no personal contact with Wyoming. They do not own residences there and do not work

13   there. (Brandon Decl. ¶¶ 2-3; Doc. 7-2, Declaration of Heidi Hallenberg ("Heidi Decl.") ¶¶ 2-3.)

14   Rather, they both live in Fresno and oversee day-to-day operations of the family's enterprise,

15   including the two California partnerships' California-based farms. (Brandon Decl. ¶ 2; Heidi

16   Decl. ¶ 2.) Plaintiffs argue that Defendant points to only one of three of Plaintiffs' business

17   interests named in this case, i.e., BDH, which ignores the focus of the claims in this lawsuit and

18   the other entities which all pertain to California.[2] (Doc. 7 at 17.)

19   　　　　"Transfer is not appropriate when it merely shifts the burden of litigating in a distant or

20   otherwise disfavored forum from the defendant to the plaintiff." *A.F.P. v. United States*, No.

21   1:21-cv-00780-DAD-EPG, 2022 WL 2704570, at *5 (E.D. Cal. July 12, 2022) (citing *Mitchell v.*

22   *1Force Gov't Sols., LLC*, No. 2:18-cv-07612-PSG-SK, 2018 WL 6977476, at *4 (C.D. Cal. Nov.

23   29, 2018)). Plaintiffs and Defendant both have contacts with Fresno and the Eastern District of

24   California—with Plaintiffs residing here, and Defendant, at a minimum, maintaining an office

25   here—but only Defendant has contact with Wyoming. Because Plaintiffs reside in this district,

26

27   [2] Defendant contends that these partnerships should be disregarded for purposes of venue, noting that Plaintiffs allege no direct causes of action against them and claiming they are sham defendants. (Doc. 5-1 at 2, 4.) Plaintiffs admit that the partnerships are being sued derivatively, which matters as to whether any given venue is proper. (Doc. 7 at 3.)

28

1    and do not work or reside in Wyoming, the convenience of the parties weighs against transfer to

2    another forum.

3          However, the crux of this action has less to do with this district.  As discussed above, the

4    material allegations in Plaintiffs' complaint concern BDH and conduct and actions taken by

5    Defendant involving BDH outside of California, largely in the District of Wyoming.  Defendant

6    has presented evidence that he resides in Wyoming and BDH is a Wyoming limited liability

7    company with its principal place of business in Wyoming.  Defendant also asserts that "a

8    substantial part of the events or omissions giving rise to the claims occurred in Wilson, Wyoming

9    since [Defendant] made all corporate decisions from his office there."  (Doc. 5-1 at 6; Darrick

10   Decl. ¶ 3.)  On balance, because the bulk of the alleged conduct occurred outside of California,

11   with certain exceptions previously discussed, this factor weighs in favor of transfer.

12         **3.   Location of where relevant agreements were negotiated and executed and**

13           **ease of access to evidence**

14         Defendant notes that BDH's corporate documents, financial transactions, tax filings and

15   business records, are all maintained in Wyoming.  (Darrick Dec. ¶ 5; Doc. 12 at 7.)  Further, BDH

16   is involved in several business ventures in Wyoming, including WB Timber, LLC, and Defendant

17   regularly worked with notaries in Wyoming to complete transactional documents.  (Doc. 5-1 at 7-

18   9.)  This factor weighs somewhat in favor of transfer.

19         Plaintiffs acknowledge that BDH's Wyoming office has copies of relevant documents, but

20   also indicate that "BDH's accountants in Fresno—Moss Adams— no doubt have copies as well."

21   (Doc. 7 at 14.).  Plaintiffs argue, however, that the ease of access to documents does not weigh

22   heavily in the transfer analysis given that advances in technology have made it easy for

23   documents to be transferred to different locations.  (*Id.*)

24         As suggested by Plaintiffs, "[e]ase of access to evidence is generally not a predominate

25   concern in evaluating whether to transfer venue because 'advances in technology have made it

26   easy for documents to be transferred to different locations.'" *Randles*, 2024 WL 1855720, *5

27   (quoting *Byler v. Deluxe Corp.*, 222 F. Supp. 3d 885, 906-07 (S.D. Cal. 2016)).  The location of

28   evidence is not a significant consideration because documentary evidence related to this case can

1    be reproduced and transmitted electronically to this court.  *See A.F.P.*, 2022 WL 2704570, at *7

2    (explaining that location of books and records is not decisive and is neutral as to transfer of case

3    because documentary evidence could be reproduced and transmitted electronically to court); *see*

4    *also Williams v. Robert Half Int'l Inc.*, No. 4:20-cv-03989-KAW, 2020 WL 12655622, at *3

5    (N.D. Cal. Sept. 18, 2020) ("[I]n the digital age, the access to records is neutral given the

6    portability of documents."). Defendants have not argued that, for example, any important

7    evidence cannot be easily transmitted to the Eastern District. *See Mazik*, 2024 WL 3011214, at *8

8    (concluding location of evidence not significant consideration where defendants did not argue

9    that evidence could not be easily transmitted to Eastern District); *Martinez v. San Diego County*,

10    No. 1:16-cv-01140-DAD-SKO, 2017 WL 1273822, at *4 (E.D. Cal. Apr. 4, 2017) ("Defendant

11    San Diego County does not allege that discovery in this case [will] implicate any unique types of

12    information that cannot be easily digitized or that any on-site inspections will be required in San

13    Diego.").  This factor is therefore neutral as to the transfer of this case.

14    **4.  Costs of litigation and time to trial**

15         Defendant generally asserts that in California, the cost of litigation tends to rise because of

16    higher legal fees, and that such fees in Wyoming are significant lower.  In support, Defendant

17    cites the average hourly rate of attorneys in California versus the average hourly rate of attorneys

18    in Wyoming.  (Doc. 5-1.)  However, this comparison between states is not determinative because

19    it provides little analysis between the legal rates in Wyoming and those in the Eastern District of

20    California, which tend to be lower than other metropolitan areas in California.

21         Defendant also posits that the fees associated with expert witnesses, depositions, and

22    court-appointed experts can be more expensive in California.  (Doc. 5-1 at 10.)  However,

23    Defendant does not identify any particular expert witnesses, cite any related costs for depositions,

24    which may sometimes be conducted by video, or verify the need for court-appointed experts.

25    Additionally, the Court notes that the convenience of expert witnesses is not generally afforded

26    significant consideration.  *See Mendoza v. In-N-Out Burgers*, No. 2:20-cv-01406-JAD-NJK, 2020

27    WL 10442992, at *2 n.7 (D. Nev. Nov. 23, 2020) (citing *Bailey v. Bernzomatic*, 2016 WL

28    11198647, at *4 (C.D. Cal. June 30, 2016)).  Thus, the Court concludes that the costs of litigation

1    do not weigh in favor of transfer.

2          Courts also consider "the administrative difficulties flowing from court congestion" in

3    considering the interest of justice. *Decker Coal*, 805 F.2d at 843.  Defendant states that "[i]t is

4    well known that this Court is significantly congested consistently carrying the average weighted

5    caseloads equal or close to twice the national average." (Doc. 5-1 at 12.)  Defendant contrasts

6    this Court's caseload to that of the District Wyoming, which reportedly "has seen a decrease in

7    filings in recent years." (*Id.*)  Plaintiffs counter that, as of March 2024, the Eastern District of

8    California had a median of 9.9 months from filing to disposition for civil cases, while Wyoming

9    had a median of 10.2 months from filing to disposition for civil cases.  (Doc. 7 at 16.)  In reply,

10   Defendant suggests that Plaintiffs' information is incomplete and misleading as it relates to the

11   aggregated time from filing to disposition.  Defendant notes that the statistics demonstrate:

12         Where there was court action before pretrial, California's Eastern District average
           for 2024 is 10.9 months, while Wyoming's average is 4.1 months. Where there
13         was court action during or after pretrial, California's Eastern District average for
           2024 is 19.1 months, while Wyoming's average is 13.8 months. Where there was
14         court action during trial, California's Eastern District average for 2024 is 60.9
           months, while Wyoming's average is undetermined (median time intervals are not
15         computed when fewer than 10 cases are reported).

16   (Doc. 12 at 8.[3])

17         This Court's overwhelming caseload has been well publicized, and the ongoing judicial

18   resource emergency in this District continues even now.  Indeed, as expressed in the Standing

19   Order, the judges of the United States District Court for the Eastern District of California "have

20   long labored under one of the heaviest caseloads in the nation even when operating with a full

21   complement of six authorized District Judges." (Doc. 11 at 4.)  Nonetheless, while court

22   congestion in this District is a factor weighing in Defendant's favor, it is not a determinative

23   factor upon which the granting of the motion to transfer should be based.  *See A.F.P.*, 2022 WL

24   2704570, at *9.  This factor thus weighs somewhat in favor of transfer.

25   ///

26

27   [3] Citing Civil Federal Judicial Caseload Statistics, Median Time From Filing to Disposition of Civil Cases,
     by Action Taken (March 31, 2024), https://www.uscourts.gov/data -news/data-tables/2024/03/31/federal-
28   judical-caseload-staatitics/c-5.

16

**5.   Convenience of the Witnesses**

"Convenience of witnesses is one of the most important factors in the determination of whether to grant a change of venue." *Randles,* 2024 WL 1855720, at *6.  A transfer of venue "may be denied when witnesses either live in the forum district or are within the 100-mile reach of the subpoena power" because individuals cannot be compelled to testify when they reside beyond the boundaries of the Court's subpoena power. *Los Angeles Memorial coliseum Comm'n v. Nat'l Football League*, 89 F.R.D. 497, 501 (C.D. Cal. 1981) (citations omitted). "To demonstrate inconvenience of witnesses, the moving party must identify relevant witnesses, state their location and describe their testimony and its relevance." *Carolina Cas. Co. v. Data Broad Corp.*, 158 F. Supp. 2d 1044, 1049 (N.D. Cal. 2001); *see also Randles*, 2024 WL 1855720, at *6.

Here, Defendant lists a number of witnesses located in Wyoming who are expected to provide testimony regarding the formation of BDH and its transition out of California to Wyoming.  (Doc. 5-1 at 11.)  These witnesses do not appear to be offered for evidence directly relevant to the underlying allegations in the complaint, and Plaintiffs note that "BDH being formed in California and then later being merged out to the BDH in Wyoming years later … is not a contested issue."  (Doc. 7 at 10.)  The remainder of Defendant's non-party witnesses are listed as (1) unnamed notaries in Wyoming to testify to transactions conducted by Defendant; (2) Nick Jones, based in Kansas City, Missouri, the developer that brokered most of BDH's real estate transactions; (3) Jeffrey Wilkinson, the accountant for the Walker entities located in Jackson, Wyoming; and (4) Chicago Title and First American Title, with offices throughout the United States.  (Doc. 5-1 at 11-12.)  Of these witnesses, only the unnamed notaries and Mr. Wilkinson are located in Wyoming.   The Court therefore finds that the convenience of these non-party witnesses weighs only minimally, if at all, in favor of transfer.

Plaintiffs instead list a number of non-party witnesses located in California, including (1) Lisa Harrison, Defendant's secretary in Danville, California, responsible for control of the UBS[4] accounts for BDH and the two California partnerships, and whose testimony reportedly "will be

---

[4] The California partnerships and BDH maintain bank accounts through UBS Financial Services Inc., a Delaware corporation doing business throughout the country.  (Doc. 5-2, Darrick Decl. ¶ 24.)

17

essential to resolving [the] issue" of the improper movement of funds to and from these accounts (Doc. 7 at 8); (2) Jenhi Ciapponi, the original whistleblower on the alleged forgeries and fraudulent practices, located at Fresno Madera Farm Credit in California, who "[w]ill be able to testify to the forgeries regarding the improper loan [Defendant] sought;" (*Id.*) (3) David Brits, a California businessman and farmer with partial ownership of the Idaho investment, FedEx Building, and WB timber LLC, alongside BDH, whose testimony "will give insight into how these properties and transactions . . . occurred and Darrick['s] due diligence or lack thereof," (*Id.* at 9); (4) Wonderful Processing Company, located in California, related to Darrick's alleged instruction to divert finds away from the partnerships' accounts, (*Id.*); (5) Almond Company, located in Madera, California, related to Darrick's alleged instruction not to remit payment to partnership accounts where either Brandon or Heidi had access, (*Id.*); and (6) Moss Adams, the accounting firm for all of the named entities in this action, and Michael Holtermann, at the Fresno branch, who is the Walker family's accountant handling the specific accounts for the named entities, (*Id.*).

On balance, the Court concludes that consideration of witness convenience and the availability of compulsory process weigh strongly against transferring venue.

### 6. Familiarity with governing law

Defendant argues that the subject of the instant action involves the management of a Wyoming limited liability company, governed by Wyoming law. To that end, Defendant contends that '[l]ocal attorneys, judges and legal professional in Wyoming are most knowledgeable about the application of Wyoming law, as they are directly responsible for interpreting and applying them." (Doc. 5-1 at 9.) Plaintiffs counter that California law applies and that a California district court is more familiar with California law. Plaintiff argues that California's choice of law rules apply in this diversity action, and that the laws of California govern the two California partnerships at issue and the complaint's causes of action directly pertaining to them. (Doc. 7 at 11-13.) Plaintiffs also suggest that "it is not clear whether even BDH, originally incorporated in California, would be governed under Wyoming law in this action." (*Id.* at 12.)

1        It is not necessary for the Court to resolve the issue of whether this action is governed by

2   California or Wyoming law. "Federal courts are deemed capable of applying the law of other

3   states." *A.F.P.*, 2022 WL 2704570, at *8 (quoting *Certain Underwriters at Lloyd's London v.*

4   *National R.R. Passenger Corp.*, No. 1:14-cv-04717-FB-RLM, 2015 WL 1182764, at *4

5   (E.D.N.Y. Mar. 13, 2015)).  Indeed, it is routine for federal courts to analyze and apply the laws

6   of diverse states.  *See Kitzler v. Nelnet Servicing, LLC*, No. CV 22-6550-MWF (KS), 2022 WL

7   18284983, at *3 (C.D. Cal. Nov. 1, 2022) (finding state most familiar with governing law a

8   neutral factor because federal courts routinely analyze and apply the laws of diverse states). The

9   District of Wyoming court is capable of deciding issues arising under California law, while the

10  Eastern District of California court is capable of deciding issues arising under Wyoming law. *See*

11  *Randles*, 2024 WL 1855720, at *6 ("The Northern District of Texas court is fully capable of

12  deciding issue arising under California law."); *Metz v. U.S. Life Ins. Co.*, 674 F. Supp. 2d 1141,

13  1148 (C.D. Cal. 2009) (indicating judges in both New York and California are fully capable of

14  deciding issues arising under both California and New York law).  This factor is therefore neutral.

15      **7.  Public Interest**

16       Defendant asserts that Wyoming supports its residents' access to courts when they have

17  substantial ties to the state, and allowing litigation in California risks creating a disconnect

18  between the laws that govern the business incorporated in Wyoming and the jurisdiction in which

19  it is resolved.  (Doc. 5-1 at 10.)  This argument is not persuasive.  As discussed, the Eastern

20  District of California is equally able to apply Wyoming law.

21       Plaintiffs argue California has interest in this action because two of the entities named in

22  this action are California partnerships.  (Doc. 7 at 11-12.)  The Court recognizes that California

23  has an interest in protecting its residents and businesses.  However, the operative facts in this

24  action generally occurred in the District of Wyoming and involved a Wyoming business, BDH.

25  The Court concludes that Wyoming has an equal or greater interest in policing the conduct of

26  companies within that state. *See Randles*, 2024 WL 1855720, at *6.  For these reasons, the Court

27  concludes that this factor supports transfer.

28  ///

                                       19

1

**IV.    CONCLUSION AND ORDER**

2

   For the reasons discussed above, the Court concludes that, albeit a close call, Defendant

3

has failed to satisfy his burden of demonstrating that a transfer would promote the convenience of

4

the witnesses or parties or would be in the interests of justice.  Accordingly, Darrick Walker's

5

motion to transfer venue under 28 U.S.C. § 1404(a) is DENIED.

6

7

IT IS SO ORDERED.

8

   Dated:   **May 7, 2025**                      /s/ *Barbara A. McAuliffe*

9

                                        UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

20